1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT
9                      EASTERN DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| 11 SOUTHERN CALIFORNIA ALLIANCE OF POTWS, et al., | No.  2:14-cv-01513-MCE-DAD |
| 12 | |
| 13         Plaintiff, | **MEMORANDUM AND ORDER** |
| 14    v. | |
| 15 UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | |
| 16 | |
| 17         Defendant. | |

18         On June 25, 2014, Plaintiffs Southern California Alliance of POTWs ("SCAP") and

19    Central Valley Clean Water Association ("CVCWA") (collectively "Plaintiffs") filed this

20    action alleging that Defendants United States Environmental Protection Agency (the

21    "EPA") and Jared Blumenfeld as the Regional Administrator of EPA Region IX

22    (collectively "Defendants") violated the Administrative Procedures Act ("APA"), 5 U.S.C.

23    §§ 551-559, and regulations implementing the Federal Water Pollution Control Act (the

24    "Clean Water Act" or the "Act"), 33 U.S.C. §§ 1251-1376.  Compl., June 25, 2014, ECF

25    No. 1.  Specifically, Plaintiffs allege that Defendants illegally and improperly approved

26    the California State Water Resources Control Board's ("State Water Board") request to

27    use a newly formulated methodology for conducting chronic whole effluent toxicity

28    ("WET") tests, known as the two-concentration Test of Significant Toxicity ("TST"), as an

1

1  Alternate Test Procedure ("ATP").  Id.  Presently before the Court is Plaintiffs' Motion for

2  a Temporary Restraining Order ("TRO") filed on June 26, 2014.  Mot., June 26, 2014,

3  ECF No. 4.  Plaintiffs ask that this Court enjoin Defendants from "giving any force and

4  effect" to its approval of the two-concentration TST and from "requiring or mandating the

5  use . . . [of] analytical results obtained through the two-concentration TST method."  ECF

6  No. 4-7 at 2 (proposed order granting TRO).  Defendants filed an Opposition, to which

7  Plaintiffs responded.  Opp'n, June 30, 2014, ECF No. 9; Reply, June 30, 2014, ECF

8  No. 10.  The Court held a hearing on the Motion on June 30, 2014.  Upon consideration

9  of the parties' filings and after hearing argument, the Motion was DENIED; this written

10  order follows.[1]

12  **BACKGROUND[2]**

14       The Clean Water Act is designed "to restore and maintain the chemical, physical,

15  and biological integrity of the Nation's waters."  33 U.S.C. § 1251(a).  The Act prohibits

16  the discharge of a pollutant from a point source into waters of the United States, except

17  as in compliance with specific provisions in the statute, including provisions regarding

18  permits issued under the National Pollutant Discharge Elimination System ("NPDES")

19  program.  The Clean Water Act gives states "the primary responsibilit[y] and right[] . . . to

20  prevent, reduce, and eliminate pollution" and encourages states to "assume the major

21  role in the operation of the NPDES program."  33 U.S.C. § 1251(b); Boise Cascade

22  Corp. v. U.S. E.P.A., 942 F.2d 1427, 1430 (9th Cir. 1991) (citing Shell Oil Co. v. Train,

23  585 F.2d 408, 410 (9th Cir. 1978)).  "California [is one of the states] that ha[s] been

24  granted authority to administer NPDES programs [itself]."  Boise Cascade Corp.,

25  942 F.2d at 1430 (citing 39 Fed. Reg. 26,061 (1973)).  "The California State Water

---

26       [1] The Court denied Plaintiffs' Motion on the record.  To the extent that this order materially differs
from the Court's ruling on June 30, 2014, the terms of this order control.

27

28       [2] Unless otherwise indicated, the facts are taken, often verbatim, from Plaintiff's TRO Motion.
See ECF No. 4.

1  Resources Control Board . . . and its various Regional Water Quality Control Boards are

2  responsible for the enforcement of the Act in California and for issuing NPDES permits."

3  Id.  However, EPA itself "promulgate[s] guidelines establishing test procedures for the

4  analysis of pollutants," which are used for certification and permit applications.

5  33 U.S.C. § 1314(h).

6      Plaintiff SCAP is a trade association that represents its agency members, who

7  treat and recycle municipal and industrial wastewater in Southern California.  Plaintiff

8  CVCWA is a non-profit industry trade association that represents municipalities and

9  other public entities located within the Central Valley region of California who provide

10  wastewater collection, treatment, and water recycling services.  The discharges to

11  surface waters from Plaintiffs' member agencies are regulated through NPDES permits

12  issued by the California Regional Water Quality Control Boards, the State Water

13  Resources Control Board, and sometimes the EPA.  However, as explained above, it is

14  the EPA that promulgates formal methods for determining whether discharged water is

15  deemed "toxic" or not.

16      Effluent limitations serve as the primary mechanism in NPDES permits for

17  controlling discharges of pollutants from point sources to receiving waters.  Water quality

18  standards are used as the basis for deriving the specific effluent limitations in NPDES

19  permits.  According to Plaintiffs, for the last decade or so, SCAP and CVCWA members

20  have been conducting WET testing of their discharges to make certain that the water

21  discharged meets the relevant environmental standards.  WET tests are designed to

22  replicate the total effect and environmental exposure of aquatic life to toxic pollutants in

23  a discharge without initially requiring the identification of the specific pollutants.

24      Under limited circumstances and subject to specific regulatory requirements, a

25  person may request to use an Alternative Test Procedure ("ATP") to measure the toxicity

26  of the effluent not previously approved and formally promulgated by the EPA.  See

27  40 C.F.R. §§ 136.4, 136.5.  "To be approved on a nationwide basis, an alternate test

28  must go through rulemaking  . . . and the regulations must be amended to add this

1  alternate test." Opp'n at 9 (citing 40 C.F.R. § 136.4(c)).  Alternatively, a different process

2  is used for limited use requests.  See 40 C.F.R. § 136.5.  "Instead, the applicant submits

3  its request to the EPA's Regional Alternate Test Procedure Coordinator."  Opp'n at 9

4  (citing 40 C.F.R. § 136.5).  "The Regional Alternate Test Procedure Coordinator has the

5  discretion to restrict the use of the alternate test procedure to a specific facility, or 'to all

6  discharger[s] or facilities (and their associated laboratories) specified in the approval for

7  the Region.'"  Id. (citing 40 C.F.R. § 136.5).

8        On February 12, 2014, the State Water Board requested Regional EPA approval

9  of "the statewide Alternate Test Procedure use of a two-concentration test design when

10 using the Test of Significant Toxicity (TST) hypothesis testing approach."  Compl. at 18.

11 On March 17, 2014, EPA Region IX "determined that the State Water Board's proposed

12 use of the two-concentration toxicity test evaluated using the Test of Significant Toxicity

13 (TST) is an acceptable equivalent under the ATP process . . ."  Id. at 24.  However,

14 Plaintiffs allege that SCAP's members did not learn of the new ATP until May 8, 2014,

15 when the NPDES permits for three of SCAP's members were reissued by the Regional

16 Water Quality Control Board for the Los Angeles Region.  According to Plaintiffs, these

17 new permits, and others, include numeric effluent limitations for chronic toxicity, and

18 require WET testing to determine compliance with these limitations using the improperly

19 adopted two-concentration TST.

20       Plaintiffs maintain that the EPA violated the APA and regulations implementing

21 the Clean Water Act when it approved the State Water Board's requested use of the two-

22 concentration toxicity test.[3]  As a result and due to alleged flaws with this new method,

23 Plaintiffs contend that their members will "suffer harm through the increased risk of non-

24

25  [3] Plaintiffs maintain that "there is a much larger story to tell than is possible in the short turnaround time for a TRO, but [that] the approval of the ATP was done because [the EPA] was unable to get internal approval from headquarters to allow use of the two-concentration TST.  As will be demonstrated in this case, the [EPA] came up with the idea to have the State request an ATP to avoid the need for rulemaking, provided extensive funding to the [EPA] for toxicity testing related activity, and [EPA] employees even edited the letter sent requesting ATP approval.  Review of the letters alone does not tell the whole story and what might appear to be lawful when viewed in isolation may be unlawful when the entire story is told."  Reply at 6.

4

1   compliance, and the need to run additional tests to be able to statistically demonstrate

2   compliance." Mot. at 10. Specifically, Plaintiffs contend that "[w]ithout injunctive relief,

3   Plaintiffs' members whose permits currently or will soon contain requirements based on

4   the two-concentration TST will be subject to enforcement and potentially liable for civil

5   and criminal penalties and citizen suits for failure to consistently comply with the new

6   final effluent limits and for undertaking more costly toxicity testing requirements based on

7   the two-concentration TST." Id. Plaintiffs allege that the first permits incorporating and

8   adopting the new test go into effect on July 1, 2014. Plaintiffs explain that such an

9   outcome will result in "economic loss in the form of additional testing required to try to

10  ensure compliance, and damage in the form of penalties and reputational injury for

11  noncompliance with permit requirements." Id. In addition, Plaintiffs also allege that the

12  State Water Board may be adopting the same mandate on July 2, 2014, and that without

13  a TRO "there is no way to influence the State Water Board to adopt anything different

14  than what the [EPA] has mandated." Id. at 11. Accordingly, Plaintiffs initiated this action

15  on June 25 and filed a Motion for TRO the following day.

16

17                                    **STANDARD**

18

19        The purpose of a temporary restraining order is to preserve the status quo

20  pending the complete briefing and thorough consideration contemplated by full

21  proceedings pursuant to a preliminary injunction. See Granny Goose Foods, Inc. v.

22  Teamsters, 415 U.S. 423, 438-39 (1974) (temporary restraining orders "should be

23  restricted to serving their underlying purpose of preserving the status quo and preventing

24  irreparable harm just so long as is necessary to hold a hearing, and no longer"); see also

25  Reno Air Racing Ass'n., Inc. v. McCord, 452 F.3d 1126, 1131 (9th Cir. 2006); Dunn v.

26  Cate, No. CIV 08-873-NVW, 2010 WL 1558562, at *1 (E.D. Cal. April 19, 2010).

27        Issuance of a temporary restraining order, as a form of preliminary injunctive

28  relief, is an extraordinary remedy, and Plaintiffs have the burden of proving the propriety

1    of such a remedy.  See Mazurek v. Armstrong, 520 U.S. 968, 972 (1997).  In general,

2    the showing required for a temporary restraining order and a preliminary injunction are

3    the same.  Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 839

4    n.7 (9th Cir. 2001).

5         The party requesting preliminary injunctive relief must show that "he is likely to

6    succeed on the merits, that he is likely to suffer irreparable harm in the absence of

7    preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

8    the public interest."  Winter v. Natural Resources Defense Council, 555 U.S. 7, 20

9    (2008); Stormans, Inc. v. Selecky, 586 F.3d 1109, 1127 (9th Cir. 2009) (quoting Winter).

10   The propriety of a TRO hinges on a significant threat of irreparable injury that must be

11   imminent in nature.  Caribbean Marine Serv. Co. v. Baldridge, 844 F.2d 668, 674 (9th

12   Cir. 1988).

13        Alternatively, under the so-called sliding scale approach, as long as the Plaintiffs

14   demonstrate the requisite likelihood of irreparable harm and show that an injunction is in

15   the public interest, a preliminary injunction can still issue so long as serious questions

16   going to the merits are raised and the balance of hardships tips sharply in Plaintiffs'

17   favor.  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-36 (9th Cir. 2011)

18   (concluding that the "serious questions" version of the sliding scale test for preliminary

19   injunctions remains viable after Winter).

20

21                                    **ANALYSIS**

22

23        "Plaintiffs bear the burden of showing that, among other things, they are likely to

24   suffer irreparable injury and the injury must be imminent in nature."  Caribbean Marine,

25   844 F.2d at 674. Reflecting this requirement, Local Rule 231(b), which governs the

26   timing of motions for TROs, states in full:

27            In considering a motion for a temporary restraining order, the
             Court will consider whether the applicant could have sought
28           relief by motion for preliminary injunction at an earlier date

                                          6

1
2
3
4

> without the necessity for seeking last-minute relief by motion for temporary restraining order. Should the Court find that the applicant unduly delayed in seeking injunctive relief, the Court may conclude that the delay constitutes laches or contradicts the applicant's allegations of irreparable injury and may deny the motion solely on either ground.

5     As alleged, Plaintiffs have been on notice of the EPA's approval of the two-

6  concentration TST since at least May 8, 2014.  See Mot. at 8 (explaining that "SCAP's

7  members first learned of this ATP on May 8, 2014, when the NPDES permits for three

8  (3) of SCAP's members were reissued by the Regional Water Quality Control Board for

9  the Los Angeles Region").[4]  Defendants therefore contend that Plaintiffs' "long delay in

10  seeking injunctive relief establishes 'a lack of urgency and irreparable harm.'"  Opp'n at

11  16 (citing Oakland Tribune, Inc. v. Chronicle Pub. Co., 762 F.2d 1374, 1377 (9th Cir.

12  1985)).  Defendants' argument is well taken.

13     Plaintiffs offer two justifications for their delay in seeking relief in this Court.  First,

14  Plaintiffs state that "[o]ne of the Plaintiffs did not even receive approval to join the

15  litigation until its Board of Directors meeting held on [June 25, 2014]."  Reply at 6.  Next,

16  Plaintiffs contend that before filing suit, "research had to be done to determine the issues

17  to be raised in the case, including the sending of a Public Record Act request and a

18  Freedom of Information Act . . . request."  Id.

19     Given that a TRO is considered to be an extraordinary remedy and Plaintiffs have

20  the burden of establishing its propriety, Plaintiffs' explanation of the reasons for their

21  delay in filing their Motion is inadequate.  Despite becoming aware of the EPA's approval

22  of the two-concentration TST on May 8, 2014, Plaintiffs took no action in this Court for

23  approximately seven weeks.  Plaintiffs could have sought a preliminary injunction,

24  without resorting to the extraordinary form of relief that is a TRO, in the interim period

25  between May 8, 2014, and June 26, 2014.  Instead, Plaintiffs waited until June 25, 2014,

26

27
28

---

[4] Defendants contend that Plaintiffs "actually learned of the Regional EPA's approval of the alternate test procedure by May 1, 2014 when the Los Angeles Regional Water Board responded in writing to comments to its draft permit for the Camarillo Sanitation District, a member of Plaintiff SCAP."  Opp'n at 10.

1  to file a Complaint and until June 26, 2014, to file the instant motion -- just two business

2  days prior to the onset of alleged irreparable harm.  Stated another way, the Court is of

3  the view that the seven-week delay between Plaintiffs' discovery of the EPA's approval

4  of the two-concentration TST and the filing of this Motion contradicts Plaintiffs' claims of

5  irreparable injury.  Under the circumstances here, seven weeks constitutes an "undue

6  delay" under Local Rule 231(b).  See Caribbean Marine, 844 F.2d at 674.[5]

7        The Court finds that Plaintiffs have not made a compelling argument to explain

8  why they could not "have sought relief by motion for preliminary injunction at an earlier

9  date without the necessity for seeking last-minute relief by motion for temporary

10  restraining order." E.D. Cal. Local R. 231(b); see, e.g., Occupy Sacramento v. City of

11  Sacramento, 2:11–CV–02873–MCE, 2011 WL 5374748 (E.D. Cal. Nov. 4, 2011)

12  (denying application for TRO for twenty-five day delay).  Accordingly, the Court denies

13  Plaintiffs' Motion on procedural grounds alone, and it is therefore unnecessary to

14  address the substantive issues of Plaintiffs' Motion at this time.

15

16                                    **CONCLUSION**

17

18        For the reasons just stated, Plaintiffs' Motion for Temporary Restraining Order,

19  ECF No. 4, is DENIED without prejudice.  As explained on the record, Plaintiffs may

20  seek a preliminary injunction through a properly noticed motion.  See E.D. Cal. Local R.

21  230; 231(d).

22        IT IS SO ORDERED.

23  Dated:  July 2, 2014

24  _____

     MORRISON C. ENGLAND, JR., CHIEF JUDGE

25  UNITED STATES DISTRICT COURT

26  _____
        [5] Despite Plaintiffs' failure to take any action in this Court prior to June 25, 2014, on June 6, 2014,
27  the Camarillo Sanitary District, a member of Plaintiff SCAP, filed a petition challenging its permit before the
     California State Water Resources Control Board.  See Opp'n at 13; Request for Judicial Notice, June 30,
     2014, ECF No. 9-2.  As Defendants point out, the Camarillo Sanitary District is represented by the same
28  counsel as Plaintiffs in this action.  See Opp'n at 13.